**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **KEVIN MORGAN,** | * | |
| **Plaintiff,** | * | |
| v | * | **Civil Action No. MJM-24-909** |
| **CHARLES CO. SHERIFF'S OFFICE,** *et al.*, | * | |
| **Defendants.** | * | |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

| | | |
|---|---|---|
| **KEVIN MORGAN,** | * | |
| **Plaintiff,** | * | |
| v | * | **Civil Action No. MJM-25-009** |
| **L. LEAPLEY,** *et al.*, | * | |
| **Defendants.** | * | |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

**MEMORANDUM OPINION**

Self-represented plaintiff Kevin Morgan filed two civil rights lawsuits concerning a use of force against him at the Charles County Detention Center ("CCDC") on January 31, 2022. Both civil actions name as defendants PFC Troy Conner, PFC David Garrison, Officer Robert Calhoun, and Officer Luke Leapley. In Civil Action MJM-24-909, Morgan also names Charles County Sheriff's Office and the Charles County Detention Center as defendants. The Amended Complaint in Civil Action MJM-24-909, ECF No. 7, concerns the same allegations and claims as the Complaint filed in Civil Action MJM-25-009, ECF No. 1, and the defendants have filed identical Motions to Dismiss or for Summary Judgment in each case. Civ. No. 24-909, ECF No. 51; Civ. No. 25-009, ECF No. 20. The two cases shall be consolidated for purposes of dispositive review.

For ease of reference, all pending motions in Civil Action 25-009[1] shall be denied without prejudice to the motions pending in Civil Action 24-909, and the motions addressed herein will refer only to those filed in Civil Action 24-909.

Morgan has filed motions for summary judgment in his favor and opposes both dismissal of the Complaint and summary judgment in favor of the defendants. ECF Nos. 44 & 56 (motions for summary judgment); ECF Nos. 46, 59 & 60 (oppositions in response). In addition, Morgan has filed motions for discovery, ECF Nos. 34 & 43; for appointment of counsel, ECF No. 40; and for leave to amend, ECF Nos. 55 & 57.

The issues pending before the Court are fully briefed; there is no need for a hearing. *See* D. Md. Local R. 105.6 (2025). For the reasons that follow, the Amended Complaint shall be DISMISSED as to defendants Charles County Sheriff's Office and Charles County Detention Center and summary judgment shall be GRANTED in favor of defendants Conner, Garrison, Calhoun, and Leapley.

## I.    BACKGROUND

At the time he filed suit, Morgan was confined at CCDC. He alleges that on January 31, 2022, at approximately 11:00 p.m., PFC Conner and PFC Garrison served him with a warrant for collection of his DNA. ECF No. 7 at 4. At the time the warrant was served, Morgan was restrained with a handcuff on his left hand that was secured to the wall of a room he refers to as "PB 3." *Id*. He states that while he was reading the warrant, Conner began trying to "stick [a] long Q-Tip in [his] mouth." *Id*. Morgan pushed back in his chair because Conner was "in [his] space." *Id*. As

---

[1] Motions pending in Civil Action 25-009 include Defendants' Motion to Dismiss, ECF No. 13; Defendants' Cross Motion for Summary Judgment, ECF No. 20; Defendants' Motion for Leave to File Physical Exhibit, ECF No. 23; Morgan's Motion for Summary Judgment, ECF No. 24; Morgan's Motion to Amend/Add Defendant, ECF No. 26; Morgan's Cross Motion for Summary Judgment, ECF No. 27; and Morgan's Motion for Leave to Amend, ECF No. 28, all of which shall be denied without prejudice to consideration of the corresponding motions filed in Civil Action 24-909, which are identical.

he pushed away, Morgan moved Conner's hand away and stood up. *Id.* In response, Morgan claims that Conner pushed him so hard against the wall that he knocked the wind out of him. *Id.* At that time, Morgan alleges that Garrison grabbed his right arm and bent it to the point it "felt like he was trying to break it." *Id.* Shortly thereafter, Officer Leapley entered the room and punched Morgan in the face; and Officer Calhoun came into the room next and grabbed Morgan's head and put him in a chokehold. *Id.* Morgan describes feeling Calhoun putting all his weight on his head and feeling like he was trying to pull his head away from his body. *Id.* at 5. He states he was in so much pain that he feared for his life. *Id.* at 5. Morgan claims that he remained restrained to the wall the entire time this force was being used. *Id.*

After he was released from the wall, Morgan recalls that he was handcuffed behind his back and taken to a bench where Sgt. Conrad collected the DNA sample. ECF No. 7 at 5. Morgan states he was never charged with anything related to this incident[2] and never heard anything again from Conner or Garrison. *Id.* He claims that his back, neck, arms, and face were in pain for days and that he had never been through anything like this incident before in his life. *Id.*

Defendants agree that Garrison and Conner came to CCDC to collect a DNA sample from Morgan pursuant to a lawfully issued warrant. They do not dispute that Morgan was handcuffed by his left arm to the back wall of "Professional Booth 3" at CCDC when they met with him to collect the DNA sample. ECF No. 51-4 at 1, ¶ 4. Conner provided the warrant to Morgan and described him as being "extremely disagreeable," as he began questioning the legitimacy of the warrant. *Id.* According to Conner, Morgan was attempting to stall the DNA collection process by

---

[2] In the investigation that followed the incident it was established that a Jail Incident Report was served on Morgan by Sgt. Conrad on February 1, 2022, and sent to the adjustment hearing officer, Cpl. Martin for resolution. ECF No. 51-2 at 15. However, the report mistakenly indicated Morgan's first name as Kenneth, not Kevin. *Id.* Kenneth Morgan is Kevin Morgan's twin brother. *Id.* Although Martin asked Conrad to fix the error and serve the corrected report, Conrad informed Martin that service of a corrected report could not be accomplished by the required deadline. *Id.* The adjustment hearing therefore did not take place due to the error in the name used on the initial report.

"talking in circles" and asking the same questions repeatedly. *Id.* Conner recalls telling Morgan that they could have correctional officers retrieve the DNA sample if necessary. When Conner and Garrison started to leave the room, Morgan told them to get the correctional officers. *Id.* Morgan then changed his mind and indicated his consent for the collection. *Id.*

Conner states that after Morgan agreed to cooperate with the collection, he swatted Conner's hands away and told him not to touch him and that he could collect the sample himself. ECF No. 51-4 at 1, ¶ 5. Morgan then tried to grab the swabs from Conner and bite down on them. *Id.* Conner explained to Morgan that he was not allowed to let him collect his own sample, and that if he could, he would, but he could not do that. *Id.* Morgan's response to Conner was to state "several times, 'if you touch me again, I'm going to hit you in your face,'" while he "balled his fist a couple times." *Id.* at 1–2, ¶ 6. When Morgan stood up, he had balled his fist and tried to take a swing at Conner but was unsuccessful. *Id.* at 2. At that time, Conner states that he "shoved [Morgan] at his torso into the wall to prevent Morgan from hitting [him], or spitting [on him,] or kicking [him]." *Id.* Conner states that he did not do anything outside of normal tactics and did not see Leapley, Calhoun, or Garrison do anything inappropriate. *Id.*

Similarly, Garrison describes Morgan as questioning the warrant when he and Conner served it on him, and when it was suggested that correctional officers could retrieve the sample, Morgan said "to just take his DNA." ECF No. 51-1 at 1, ¶ 4. Garrison states that because Morgan bit at the stick, was jerking his hands, and made a fist a few times during the DNA collection, he believed Morgan was going to hit Conner. *Id.* at ¶ 5. Morgan stood up, and Conner attempted to get him under control and secure him to the wall. *Id.* Garrison recalls that he grabbed Morgan's free hand and arm as Morgan struggled and secured Morgan's arm behind his back to keep him from hitting Conner. *Id.* Garrison explains that he placed Morgan's "free hand and arm behind

his back in the lower part of the back where [officers] have been trained for arrests." *Id*. Garrison denies jerking or tweaking Morgan's arm or doing anything to cause him harm. *Id*. He adds that Calhoun secured Morgan's head and upper body to keep him from flailing, which Garrison characterizes as "nothing out of the ordinary." *Id*. at ¶ 6. Leapley helped Garrison secure Morgan's free arm. *Id*. at ¶ 7.

Leapley adds that he heard and saw officers struggling with Morgan in Professional Booth 3 on the date in question, and he called a "signal 13 for officers in need of assistance." ECF No. 51-6 at 1, ¶ 3. Leapley, accompanied by Calhoun, ran into the room where they saw Conner and Garrison actively struggling with Morgan against the wall as Morgan was attempting to push them off. *Id*. Leapley explains that he tried to get Morgan against the wall, and "[Morgan's] face was the only spot [he] could get to and when [he] realized it was [Morgan's] face, [Leapley] changed the position of [his] hands." *Id*. Leapley denies striking or punching Morgan or doing anything to cause him harm, but states that Morgan was resisting. *Id*. He adds that he did not see anyone else do anything inappropriate or outside the parameters of normal tactics. *Id*. at ¶ 4.

Calhoun states that when he entered the room with Leapley, he believed Morgan was going to spit so his reaction was to "put Morgan's head down." ECF No. 51-7 at 1, ¶ 3. Calhoun put Morgan in a bear hug and had him "wrapped around the shoulder and under [Calhoun's] arm." *Id*. Calhoun explains that he was "very careful not to put Morgan in a chokehold." *Id*. When Morgan tried to stand up, Calhoun recalls that he "dropped his weight to keep him from standing up." *Id*. After ten to fifteen seconds, Calhoun states that Morgan stopped trying to stand and he transitioned from a bear hug to just placing his hands on Morgan's head. *Id*. According to Calhoun, he was "attempting to assist with gaining control" while remaining "mindful that [Morgan] was handcuffed by his left arm to the back wall, so [the officers] could not safely take him to the

ground." *Id*. Calhoun adds that neither he, nor any of the other officers present, did anything inappropriate or outside of normal tactics. *Id*. at ¶ 4.

The video recording of the interaction between Morgan and the officers confirms that a use of force occurred. ECF No. 50-1 (physical exhibit filed separately). However, it also confirms that Morgan was given time to read the warrant while Garrison and Conner stood by and waited for him to finish. Although the video submitted to the Court does not have sound, Morgan appears to speak to the officers while reviewing the warrant, and Garrison and Conner respond several times. Eventually, Conner approaches Morgan to swab the inside of his mouth, whereupon Morgan sits back away from Conner, appearing to object. Conner takes a half-step back and appears to speak to Morgan, while Garrison remains positioned on the opposite side of the table observing. Conner steps away from Morgan, crosses his ankles and places his right hand on the wall in a relaxed stance as though he was having a casual conversation with Morgan. Morgan appears to be speaking about the warrant as he holds up pages of the warrant and looks toward Garrison as he speaks and then looks back at the papers he was holding. During the conversation, Morgan makes hand gestures as if discussing how the swab will be administered. Garrison begins to gather the items he and Conner brought into the room for the DNA collection, and they both turn as if to leave the room. Garrison and Conner appear to continue talking to Morgan as they continue preparing to leave. When Garrison opens the door to leave, Morgan says something, Garrison closes the door, and then he and Conner come back into the room.

Upon his return, Conner immediately begins to swab the inside of Morgan's mouth. After completing the first swab, Conner attempts to swab the inside of Morgan's mouth with a second swab. After Conner inserts the swab into Morgan's mouth, Morgan grabs Conner's hand and pushes it away. When Conner attempts to do it again, Morgan repeatedly moves his face away,

indicating he does not want to cooperate with the procedure.  There appears to be words exchanged between Morgan and Conner just before Morgan stands up, taking on what appears to be a fighting stance.  Conner places his hands on Morgan's shoulders and pushes him back down into the chair.  Then, Conner holds onto Morgan's arm and stands in a lunge stance.  Garrison then comes around to the other side of the table and grabs Morgan's wrist.  It is difficult to see what Garrison is doing as he draws closer to Morgan, but he is on Morgan's right side, near his free arm.  Morgan continues to struggle against Conner and Garrison as they attempt to pin him against the wall.

As the struggle continues, two additional officers enter the room.  The first officer to enter the room, Calhoun, positions himself beside Conner and reaches behind Morgan, while the second officer, Leapley, positions himself in front of Morgan between Garrison and Conner.  Leapley places his hand on the side of Morgan's head but does not appear to strike Morgan. Next, Morgan's body folds forward toward the floor.  Calhoun reaches down around Morgan's torso and places him in a bear hug with Morgan's head pointed into Calhoun's abdomen area. Garrison and Leapley assist Calhoun in gaining control of Morgan by holding his free arm against the lower part of his back, as Morgan continues to struggle and Calhoun positions himself in front of Morgan.  A fifth officer then enters the room to begin unlocking the restraint from Morgan's left wrist.  Morgan remains physically restrained while he is released from the wall, and Garrison and the fifth officer place cuffs on Morgan's wrists, behind his back.  After he is restrained in handcuffs, he is released from the bear hug and taken out of the room by the officers.

In his second motion for summary judgment, Morgan maintains that because he did not make any aggressive moves toward Conner such as swinging his fist or kicking him, Conner's act of forcing him against the wall was unjustified under the circumstances.  ECF No. 56-1 at 2.  He explains that he was confused and asked for a lawyer because he believed his constitutional rights

were being violated, but Conner and Garrison told him a lawyer would not help him. *Id*. Morgan claims that the warrant contained a statement regarding his twin brother and explained that any DNA taken from him would also match his twin brother. *Id*. Morgan states that he did not understand the warrant and was upset because he believed Conner and Garrison were not being honest with him, and he verbally refused to submit to the test. *Id*. At that point, Morgan recalls that he was told that correctional officers would "use the restraint chair" to retrieve the sample if necessary. *Id*. Morgan does not claim that he changed his mind about consenting to the test; rather, he claims that Garrison and Conner came back after they had started to leave and forcefully tried to stick the swab in his mouth. *Id*.

Morgan further claims that when Leapley entered the room, he did not simply touch Morgan's face but hit his face. ECF No. 56-1 at 3. Morgan further claims that Calhoun put him in a chokehold or headlock, not a bear hug. *Id*. at 3–4. He claims the force that Leapley and Calhoun used against him was also inappropriate because he remained chained to the wall and he never tried to spit on, kick, or head-butt any of the officers. *Id*.

## II. NON-DISPOSITIVE MOTIONS

### A. Motion to Appoint Counsel

In his motion for representation (ECF No. 40), Morgan states that he remains incarcerated in CCDC, he is indigent, and he is confused about how to litigate his case. He asserts that his case is not frivolous or a waste of the Court's time.

There is no absolute right to appointment of counsel in a civil case. *See Miller v. Simmons*, 814 F.2d 962, 966 (4th Cir. 1987). A federal district court judge's power to appoint counsel under 28 U.S.C. § 1915(e)(1) is a discretionary one and may be considered where an indigent claimant presents exceptional circumstances. *See Cook v. Bounds*, 518 F.2d 779, 780 (4th Cir. 1975);

8

*Branch v. Cole*, 686 F.2d 264, 266 (5th Cir. 1982). Exceptional circumstances exist where a "pro se litigant has a colorable claim but lacks the capacity to present it." *Whisenant v. Yuam*, 739 F.2d 160, 163 (4th Cir. 1984), *abrogated on other grounds by Mallard v. U.S. Dist. Ct.*, 490 U.S. 296, 298 (1989) (holding that 28 U.S.C. § 1915 does not authorize compulsory appointment of counsel); *see also Jenkins v. Woodard*, 109 F.4th 242, 248 (4th Cir. 2024) ("[A] district court must conduct a fact specific, two-part inquiry to assess whether a case presents exceptional circumstances before it decides whether to appoint counsel[,]" to include deciding "whether the plaintiff has a colorable claim" and, "considering the claim's objective complexity and the plaintiff's subjective abilities, whether the plaintiff lacks the capacity to present it." (internal quotation marks and citations omitted)). Exceptional circumstances include when a litigant "is barely able to read and write," *Whisenant*, 739 F.2d at 162, or clearly "has a colorable claim but lacks the capacity to present it," *Berry v. Gutierrez*, 587 F. Supp. 2d 717, 723 (E.D. Va. 2008) (citing *Waller v. Butkovich*, 584 F. Supp. 909, 947 (M.D.N.C. 1984)).

Morgan has established that he has the capacity to present his claim and that he is able to comprehend the legal principles involved in the case. Exceptional circumstances do not exist to justify appointment of counsel for Morgan. Therefore, his motion shall be denied.

**B.      Motions for Discovery**

In Morgan's first motion for discovery, he seeks to obtain the video surveillance depicting the incident; all documents related to the incident; the search warrant requiring his DNA; Internal Affairs reports and the outcome of any investigations; and all request slips, grievances, and appeals. ECF No. 34 at 2. In his second such motion, Morgan adds an inquiry about what occurred with his DNA after it was collected and no charges were filed against him. ECF No. 43 at 3.

Formal discovery has not been conducted in this case. The Fourth Circuit has emphasized

that discovery is "broadly favored" in advance of reaching summary judgment, and district courts are to afford pro se plaintiffs leniency in regard to the requirements of Federal Rule of Civil Procedure 56(d). *Farabee v. Gardella*, 131 F.4th 185, 193–95 (4th Cir. 2025). When a court is presented with a motion for summary judgment, Rule 56(d) provides the following:

> If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts to justify its opposition, the court may:
>
> (1) Defer considering the motion or deny it;
> (2) Allow time to obtain affidavits or declarations or to take discovery; or
> (3) Issue any other appropriate order.

Fed. R. Civ. P. 56(d). Ordinarily, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont de Nemours and Co. v. Kolon Industries, Inc.*, 637 F.3d 435, 448–49. Nevertheless, a plaintiff "cannot simply demand discovery for the sake of discovery." *Hamilton v. Mayor & City Council of Baltimore*, 807 F. Supp. 3d 331, 342 (D. Md. 2011).

Analyzed under foregoing standards, Morgan's requests, to the extent they are not moot, must be denied. Morgan's request for the video surveillance is moot as it has been provided to him and filed with the Court in connection with the parties' dispositive motions. Additionally, Defendants have filed with the Court, and served on Morgan, the Internal Affairs investigative report generated in the wake of the incident giving rise to this lawsuit, making that part of Morgan's request for discovery moot as well. ECF Nos. 51-2 & 51-9. The search warrant and any information regarding the use of Morgan's DNA are not relevant to the question of whether the force used by Defendants was excessive. Further, Defendants have not raised the affirmative defense that Morgan failed to exhaust administrative remedies, and, therefore, any need to demonstrate exhaustion of administrative remedies is obviated. Morgan's motions for discovery shall be denied.

10

### C.    Motions to Amend

Morgan filed motions to amend his Complaint to add Charles County as a defendant. ECF Nos. 55 & 57. Morgan states that he was told by the Court that Charles County Sheriff's Office was not a proper defendant and therefore wants to name Charles County as a defendant instead. *Id*. He does not include any allegations against the county.

Pursuant to Federal Rule of Civil Procedure 15(a), "[a] party may amend its pleading once as a matter of course no later than: (A) 21 days after serving it, or (B) if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier." Fed. R. Civ. P. 15(a)(1). "In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). Rule 15 dictates that "[t]he court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). If the proposed amendment appears to be futile, this Court has the discretion to deny leave to amend. *Laber v. Harvey*, 438 F.3d 404, 426 (4th Cir. 2006). A proposed amendment is futile when it is "clearly insufficient or frivolous on its face." *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 510 (4th Cir. 1986) (citations omitted).

When a defendant is named in the caption of a complaint but no specific allegations are raised against it, it is entitled to dismissal from suit. Further, to impose liability on a municipality, such as Charles County, there must be something more than just an allegation that its employees engaged in wrongdoing. "A municipality cannot be held liable solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under [42 U.S.C.] § 1983 on a *respondeat superior* theory." *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 691 (1978); *see also Simons v. Montgomery County Police Officers*, 762 F.2d 30, 33 (4th Cir. 1985). The *Monell* Court explained that "when execution of a government's policy or custom, whether

11

made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury the government as an entity is responsible under § 1983." *Id*. at 694; *see also Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004).  There is no such allegation here. Therefore, the Court finds Morgan's proposed amendment to be futile, and his motions to amend shall be denied.

## III.    DISPOSITIVE MOTIONS

### A.  Standard of Review

Defendants move to dismiss the Complaint for failure to state a claim or, alternatively, for summary judgment.  ECF No. 51.  To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff must plead enough factual allegations "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). A complaint need not include "detailed factual allegations," but it must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 555–56 (internal quotation marks omitted).  When considering a motion to dismiss, a court must take the factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016). At the same time, "a court is not required to accept legal conclusions drawn from the facts." *Retfalvi v. United States*, 930 F.3d 600, 605 (4th Cir. 2019) (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

"[P]ro se filings are 'h[e]ld to less stringent standards than formal pleadings drafted by lawyers.'" *Folkes v. Nelsen*, 34 F.4th 258, 272 (4th Cir. 2022) (quoting *Haines v. Kerner*, 404 U.S.

519, 520 (1972)). Accordingly, the Court must construe pro se pleadings liberally. *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 618 (4th Cir. 2020), *cert. denied*, 141 S. Ct. 1376 (2021). But "liberal construction does not require [the Court] to attempt to 'discern the unexpressed intent of the plaintiff[;]'" the Court need only "determine the actual meaning of the words used in the complaint." *Williams v. Ozmint*, 716 F.3d 801, 805 (4th Cir. 2013) (quoting *Laber v. Harvey*, 438 F.3d 404, 413 n.3 (4th Cir. 2006) (en banc)). Thus, a pro se complaint "still 'must contain enough facts to state a claim for relief that is plausible on its face.'" *Thomas v. The Salvation Army S. Territory*, 841 F.3d 632, 637 (4th Cir. 2016) (quoting *King*, 825 F.3d at 212, 214 (quoting *Twombly*, 550 U.S. at 570)).

Ordinarily, a court "is not to consider matters outside the pleadings or to resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways, Inc.*, 510 F.3d 442, 450 (4th Cir. 2007). If the court considers matters outside the pleadings pursuant to Rule 12(d), "the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). If the court converts the motion to dismiss to a motion for summary judgment in this fashion, "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." *Id*. A court may not convert a motion to dismiss to one for summary judgment *sua sponte* unless it provides notice to the parties that it will do so. *See Laughlin v. Metro Washington Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998) (noting that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)). However, when the movant expressly captions its motion "in the alternative" as one for summary judgment and submits matters outside the pleadings for the court's consideration, the parties are deemed to have notice that conversion under Rule 12(d) may occur, and the court need not "notify parties of the obvious." *Id*.

13

Defendants and Morgan each move for summary judgment in their favor. ECF Nos. 44, 51 & 57. Summary judgment is appropriate when the moving party establishes that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To meet its burden, the party must identify "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials" in support of its position. Fed. R. Civ. P. 56(c)(1)(A). "[T]o avoid summary judgment, the opposing party must set forth specific facts showing that there is a genuine issue for trial." *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 205 (4th Cir. 2019) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

A dispute of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The opposing party must identify more than a "scintilla of evidence" in support of its position to defeat the motion for summary judgment. *Id.* at 251. A plaintiff opposing summary judgment must present "evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252. A party can establish the absence or presence of a genuinely disputed fact through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). The Court "should not weigh the evidence." *Perkins*, 936 F.3d at 205 (quoting *Anderson*, 477 U.S. at 249). However, if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," then summary judgment is proper. *Id.* (quoting *Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 119 (4th Cir. 1991)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In ruling on a motion for

summary judgment, this Court "view[s] the facts and inferences drawn from the facts in the light most favorable to . . . the nonmoving party." *Perkins*, 936 F.3d at 205 (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 958 (4th Cir. 1996)).

Summary judgment is generally improper "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont*, 637 F.3d 435, 448–49. However, the non-moving party cannot "complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery." *Evans*, 80 F.3d at 961. "If a party believes that more discovery is necessary for it to demonstrate a genuine issue of material fact, the proper course is to file a [Fed. R. Civ. P. 56(d)] affidavit." *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002). A Rule 56(d) affidavit specifies reasons the non-moving party "cannot present facts essential to justify its opposition" to a summary judgment motion. Fed. R. Civ. P. 56(d). "[F]ailure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate." *Harrods Ltd.*, 302 F.3d at 244 (quoting *Evans*, 80 F.3d at 961).

The Fourth Circuit has made clear that "it is appropriate to excuse 'technical noncompliance' with Rule 56(d), especially with pro se plaintiffs where the district court is put on 'fair notice of a potential dispute as to the sufficiency of the summary judgment record.'" *Firewalker-Fields v. Lee*, 58 F.4th 104, 123 (4th Cir. 2023) (quoting *Pledger v. Lynch*, 5 F.4th 511, 526 (4th Cir. 2021)).  A pro se party, however, must still demonstrate that he seeks discovery and that such discovery would be relevant to dispute the motion for summary judgment. *Id.*; *see also Mohn v. Progressive Ins.*, 802 F. App'x 391, 396 (10th Cir. 2020) (holding that where a defendant fails to submit affidavits as required by Rule 56(d), "his pro se status does not excuse this failure") (citation omitted)).  Notwithstanding a plaintiff's self-represented status, he must still "put the

15

court on notice that there [is] [a] possible dispute about the sufficiency of the evidence for [his] claim[,]" and that discovery would aid "in developing essential facts …" *Firewalker-Fields*, 58 F.4th at 124. As already noted, Morgan's requested discovery does not meet this standard and is denied.

### B. Analysis

At the time of the events forming the basis of his Complaint, Morgan was a pretrial detainee. The Supreme Court held in *Kingsley v. Hendrickson* that "the appropriate standard for a pretrial detainee's excessive force claim is solely an objective one." 576 U.S. 389, 397 (2015). It is enough that a pretrial detainee shows that the "force purposely or knowingly used against him was objectively unreasonable," *id.*, regardless of an officer's state of mind, *id.* at 395 (cited in *Dilworth v. Adams*, 841 F.3d 246, 255 (4th Cir. 2016)). Pursuant to *Kingsley*, this Court must consider whether under the "facts and circumstances" of this particular case, and from the "perspective of a reasonable officer on the scene," the force used against Morgan was objectively excessive. *Kingsley*, 576 U.S. at 397. This Court must also "account for the 'legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained,' appropriately deferring to 'policies and practices that in th[e] judgment' of jail officials 'are needed to preserve internal order and discipline and to maintain institutional security.'" *Id.* (quoting *Bell v. Wolfish*, 441 U.S. 520, 540 (1979) (brackets in original)).

Here, Morgan admits he did not cooperate with the execution of a lawfully issued warrant and that he verbally refused to do so. *See* ECF No. 56-1 at 2. And the video evidence confirms his refusal to cooperate. None of his explanations are sufficient to justify his failure to cooperate with the warrant. The officers who were there to carry out orders issued by a judge had no power to alter the order, nor would they have any additional information to offer.

16

Morgan's aggression toward Conner and Garrison, easily discernible on the video evidence submitted, was a valid reason for the physical restraint by the officers that ensued.  Morgan's claim that no force should have been used against him because he did not swing his fist, kick, or spit is without merit.   To determine if the officers' actions in restraining Morgan were objectively reasonable, this Court must examine "'the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.'" *Lombardo v. City of St. Louis, Missouri*, 594 U.S. 464, 467 (2021) (quoting *Kingsley*, 576 U.S. at 397).  Here, Morgan was actively resisting Conner's attempt to collect his DNA and became threatening when he stood up taking what appears to be a fighting stance.  The scuffle continued due to Morgan's continued resistance, as seen in the video. The officer pinned Morgan against the wall in an effort to prevent him from being harmed because he was handcuffed to the wall; as soon as he was released from that restraint and he was safely handcuffed behind his back, he was released from the physical hold Calhoun had on him.  Morgan's claim that Leapley hit him in the face is also not supported by the video; rather, Leapley's assertion that he placed his hand on Morgan's face and moved it quickly thereafter is supported by the video. Morgan did not sustain any notable injuries.

In all material respects, Defendants' version of events is supported by the video and Morgan's are contradicted.  Although the Court cannot resolve conflicting affidavits on summary judgment, where a party's contention is clearly contradicted by a video recording of the incident, summary judgment is appropriate.  *See Witt v. W. Va State Police, Troop 2*, 633 F.3d 272, 276 (4th Cir. 2011) (stating that "when a video 'quite clearly contradicts the version of the story told by [the plaintiff] . . . so that no reasonable jury would believe it, a court should not adopt [the plaintiff's]

version of the facts for purposes of ruling on a motion for summary judgment.'") (quoting *Scott v. Harris*, 550 U.S. 372, 378 (2007)).   Here, summary judgment in favor of Defendants Conner, Garrison Leapley, and Calhoun shall be granted.

The remaining Defendants, Charles County Sheriff's Office and Charles County Detention Center, must be dismissed.   The CCDC is not an entity that may be sued under 42 U.S.C. § 1983, which provides in pertinent part that:

> Every *person* who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . . subjects, or causes to be subjected, any citizen of the United States or other person with the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured . . .  (emphasis supplied).

The detention center is not a "person" within the meaning of the statute and is therefore not a proper defendant in this case.   The motion to dismiss will be granted as to Charles County Detention Center.

The Charles County Sheriff's Office must be dismissed on Eleventh Amendment immunity grounds.   As a matter of Maryland law, county sheriffs and deputy sheriffs are officials and/or employees of the State, not the county.  *See Rucker v. Harford Cnty*, 558 A.2d 399, 402 (Md. 1989). Under the Eleventh Amendment to the United States Constitution, a state, its agencies, and departments are immune from suits in federal court brought by its citizens or the citizens of another state, unless it consents.  *See Pennhurst State Sch. and Hosp. v. Halderman*, 465 U.S. 89, 100 (1984).  "It is clear, of course, that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment." *Id*. (citing *Florida Department of Health v. Florida Nursing Home Assn.*, 450 U.S. 147 (1981) (per curiam)).   While the State of Maryland has waived its sovereign immunity for certain types of cases brought in its courts, *see* Md. Code Ann., State Gov't § 12-201(a), it has not waived its

18

immunity under the Eleventh Amendment to suit in federal court. "A State's constitutional interest in immunity encompasses not merely *whether* it may be sued, but *where* it may be sued." *Halderman*, 465 U.S. at 100 (emphasis in original).

To the extent that Morgan is raising a state tort claim pursuant to the Maryland State Tort Claims Act, this Court declines jurisdiction over such a claim. "When, as here, the federal claim is dismissed early in the case, the federal courts are inclined to dismiss the state law claims without prejudice rather than retain supplemental jurisdiction." *Carnegie Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988) (citing *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726–727 (1966)). Any claims of this kind shall be dismissed without prejudice.

Further, to the extent that Morgan is raising a claim based on respondeat superior for failure to intervene on his behalf, the claim fails. Liability under § 1983 attaches only upon personal participation by a defendant in the constitutional violation. It is well established that the doctrine of respondeat superior does not apply in § 1983 claims. *See Love-Lane*, 355 F.3d at 782 (no respondeat superior liability under § 1983). Liability of supervisory officials "is not based on ordinary principles of respondeat superior, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)). To state a claim for supervisory liability under § 1983 based on a subordinate's conduct, the plaintiff must allege that (1) the supervisor had actual or constructive knowledge that subordinate's conduct "posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff" (2) the supervisor responded in a manner that was so inadequate that it showed "deliberate indifference to or tacit authorization" of the subordinate's conduct; and (3) there was "an affirmative causal

link between the supervisor's inaction" and the plaintiff's constitutional injury. *Timpson by & through Timpson v. Anderson Cnty. Disabilities & Special Needs Bd.*, 31 F.4th 238, 257 (4th Cir. 2022) (quoting *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994)).  Morgan has failed to adequately plead such a claim against any cognizable party.  The Charles County Sheriff's Office will be dismissed from suit.

## VI.    CONCLUSION

By separate Order which follows, Defendants are granted summary judgment in these consolidated cases and all other pending motions are denied.

_3/3/26_____
Date

Matthew J. Maddox
United States District Judge

20